GRAHAM FORSHER,    :
          :
     Plaintiff,  :  Case No. 5:19CV00194
          :
   v.      :  Judge John R. Adams
          :
THE J.M. SMUCKER CO.,  :  **ORDER**
          :
     Defendant. :
          :

This matter is before the Court on the motion of J.M. Smucker Co., Inc. ("Smucker") to dismiss the putative class action claims of Plaintiff Graham Forsher under Federal Rule of Civil Procedure 12(b)(6). The motion is ripe for consideration. Having fully considered the pleadings, the parties' arguments, and applicable law, the Court hereby ORDERS that the Motion to Dismiss (Doc. 89) is GRANTED. Furthermore, Plaintiff's Motion to Change or Transfer Venue to the Northern District of California (Doc. 93) is DENIED AS MOOT. The reasons for the Court's ruling are set forth below.

## I. **BACKGROUND**

Defendant Smucker manufactures, markets, and sells peanut butter products throughout the United States. Plaintiff Graham Forsher claims he was misled when he allegedly purchased an unspecified variety of Defendant's natural peanut butter – Jif® Natural Peanut Butter Spread (the "Products"). (Compl. ¶ 11.) The Products come in three varieties: Jif® Natural Creamy Peanut Butter Spread, Jif® Natural Crunchy Peanut Butter Spread, and Jif® Natural Honey. (*Id.* ¶ 3.) The gravamen of Plaintiff's complaint is that he purchased the Products because the label described them as "natural." However, he alleges the Products are not natural and, therefore, the

label is misleading because the Products "may" contain sugar "derived from" bioengineered or genetically modified ("GMO") beets.  (*Id.* ¶¶ 5-9.)

The FDA regulates food labeling and defines a bioengineered or GMO food as a "substance that contains genetic material that has been modified through in vitro recombinant deoxyribonucleic acid (rDNA) techniques for which the modification could not otherwise be obtained through conventional breeding or found in nature."  7 C.F.R. § 66.1(1)(i).  Beginnning in 1992, the FDA began looking into whether bioengineered foods needed additional regulations.  *See, e.g.*, *Statement of Policy:  Foods Derived From New Plant Varieties*, 57 Fed Reg. 22,984,. 22, 991 (May 29, 1992) (declining to further regulate "foods developed using techniques such as recombinant DNA techniques would be required to bear special labeling to reveal that fact to consumers.")  The FDA answered this question in the negative, noting these "new techniques are extensions at the molecular level of traditional methods and will be used to achieve the same goals as pursued with traditional plant breeding."  *Id.*  As for food where none of the ingredients were themselves bioengineered but where ingredients were derived from bioengineered sources, the FDA determined that a product label does not need to disclose this information.  *See* 7 C.F.R. § 66.116(b) (Voluntary Disclosure).

Additionally, the USDA, which regulates food processing and food distribution, recently announced the National Bioengineered Food Disclosure Standard.  National Bioengineered Food Disclosure Standard, 83 Fed. Reg. 65,814 (Dec. 21, 2018) (to be codified at 7 C.F.R. pt. 66).  This rule determined that only foods containing "detectable genetic material that has been modified through certain lab techniques and cannot be created through conventional breeding or found in nature" must be disclosed.  UNITED STATES DEPARTMENT OF AGRICULTURE, BE DISCLOSURE, http://www.ams.usda.gov/rules-regulations/be (last visited July 2, 2019).

Importantly, though, even if GMO sugar beets meet this standard, the refined sugar derived from bioengineered beets does not contain any "detectable genetic material" that could be considered bioengineered (83 Fed. Reg. 65,814, 65,833), meaning refined sugar derived from sugar beets does not need to be disclosed. *Id.* ("[B]ased on the available scientific evidence, refined beet and cane sugar . . . are unlikely to require BE food disclosure because the conditions of processing serve effectively to degrade or eliminate the DNA that was initially present in the raw agricultural commodity.")

The FDA has considered the issue of the use of the term "natural" in food labeling. In 1991, it announced its informal policy stating that it "consider[s] 'natural' to mean nothing artificial or synthetic (including colors regardless of source) is included in, or has been added to, the product that would not normally be expected to be there." *Food Labeling: Nutrient Content Claims, General Principles, Petitions, Definitions of Terms,* 56 Fed. Reg. 60,421, 60,466 (Nov. 27, 1991). Moreover the FDA noted that the term "natural" does not have a settled definition among consumers and retailers, but instead is used to convey "a variety of things." *Id.* In 2015, the FDA requested comment on whether it should establish a definition for the term "natural" in food labeling. *See Use of the Term "natural" in the Labeling of Human Food Products; Request for Information and Comments*, 80 Fed. Reg. 69,905 (Nov. 12, 2015). At this point the FDA again reiterated that it did not consider the term "natural" to encompass "food production methods, such as the use of genetic engineering or other forms of genetic modification." *Id.* at 69,906. To date, the FDA has not issued any rulemaking or regulations on the term "natural," nor has it revised its policy regarding the term.

Plaintiff's basic contention is that the Products are made with sugar which may be derived from bioengineered sugar beets. Compl. ¶ 24. Plaintiff believes this makes the Product

labels, describing the Products as "natural," misleading. *Id.* at ¶¶ 25-27. His argument is that where food is made with ingredients *possibly* derived from bioengineered food, it is misleading for the Products' labels to say "natural." *Id.* at ¶¶ 27-31. Using this theory, he seeks to certify two classes. *Id.* at ¶ 40. The first is a California Class, which consists of consumers who purchased the Products for personal use within California during the Class Period. *Id.* at ¶ 40(A) The second is a Multi-State Class, which consists of consumers who purchased the Products for personal use during the Class Period in 44 states. (Compl. ¶ 40(B).) He also asserts four claims for relief: (1) violation of the California Consumers Legal Remedies Act ("CLRA") (Count I, California Class); (2) violation of the California False Advertising Law ("FAL") (Count II; California Class); (3) violation of the California Unfair Competition Law ("UCL") (Count III, California Class); and (4) breach of express warranty (Count IV; Multi-State Class). (*Id.* at ¶¶ 43-88. Plaintiff has withdrawn a claim for violation of the Ohio Deceptive Trade Practices Act ("ODTPA") (Count IV; Multi-State Class), and a claim for violation of the Ohio Consumer Sales Practices Act ("OCSPA") Count V; Multi-State Class). (Brief in Opp., ECF-90, p. 16.) Plaintiff seeks compensatory damages, disgorgement, restitution, punitive damages, and other relief as the Court deems proper. Id. at ¶ 29.

## II.    <u>LEGAL STANDARD</u>

Rule 12(b)(6) permits a party to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Although the Court must accept Plaintiff's factual allegations as true, it is not required to accept "legal conclusions" as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To support his claim, "Plaintiff must offer 'either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'" *St. Clair v. Kroger Co.*, 581 F. Supp. 2d 896, 899 (N.D. Ohio 2008).

Claims sounding in fraud must meet the heightened pleading standard under Rule 9(b). "It is well-settled in the Sixth Circuit that circumstances constituting fraud include 'the time, place, and content of the alleged misrepresentation.'" *Pattie v. Coach, Inc.,* 29 F. Supp. 3d 1051, 1059 (N.D. Ohio 2014). "The plaintiff must also allege 'the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud'" so that the defendant has enough information to "mount a complete defense." *Id.*

Finally , the Court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The Court may strike defective class allegations at the pleading stage when those claims could not satisfy the Rule 23 requirements. *Pilgrim v. Universal Health Card, LLC*, 2010 WL 1254849, at *5 (N.D. Ohio March 25, 2010) (Adams, J.).

## III. <u>DISCUSSION</u>

### A. <u>Plaintiff's Factual Allegations Do Not Satisfy Rule 9(b)</u>

Plaintiff's California claims sound in fraud and therefore must be pled with particularity in accordance with Rule 9(b). *In re Apple & AT&T iPad Unlimited Data Plan Litig.*, 802 F. Supp. 2d 1070, 1075 (N.D. Cal. 2011) ("Rule 9(b)'s heightened pleading standards apply to CLRA and UCL claims [] because those claims are 'grounded in fraud' or 'sound in fraud.' For the same reasons, courts have also applied Rule 9(b) to claims under California's FAL.").

Here, Defendant argues that Plaintiff's factual allegations are deficient as he fails to identify what Products he purchased, from where, and at what time beyond a two-year window from late 2013 to late 2015. (Comp. ¶ 1); *see Pattie*, 29 F. Supp. 3d at1059 (dismissing consumer deception claims under Rule 9(b) for failure to plead "which store she was shopping at

when she received the [allegedly deceptive] coupons," failing to "identify when she shopped there," or provide more specifics than just a "several month time span"). The Court agrees.

Plaintiff ignores that he must plead more than just generalities. *Sanderson v. HCA-The HealthcareCo.*, 447 F.3d 873, 877 (6th Cir. 2006) ("We have further interpreted Rule 9(b) to require that a plaintiff allege the time, place, and content of the alleged misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." (Internal quotation and citation omitted.) He contends that he must merely pled the "who, what, when, where, and how" of the offensive conduct. (Opp. p. 5.) However, these generalities do not satisfy the pleading standard for fraud.

In the Opposition, instead of providing context about why he meets the particularity threshold, Plaintiff simply parrots back his Complaint. He merely repeats his "what" allegation, that "Defendant's material misrepresentations that the Products are 'natural,' when they are not because they contain GMO-derived ingredients." (Opp. p. 5; Compl. ¶ 35.) Yet, throughout history, humans have modified crops through selective breeding. Plaintiff fails to provide allegations as to when a consumer would consider a crop "genetically modified" such that it is unnatural. Nor does he ever identify what the unnatural genetic material is, and whether, if the sugar is derived from GMO sugar beets, the sugar contains any offending genetic material.

Plaintiff's "when" allegation, "continuously and at every point of purchase and consumption throughout the Class Period" (Opp. p. 5; Compl. ¶ 36), fares no better, as it is far too broad to be particularized. *See Pattie*, 29 F. Supp. 3d at 1059 (finding that "[t]he identification of the several month time span encompassed by 'Spring, 2013' is not particular" enough for Rule 9(b)). Plaintiff's two-year window for possible purchase of the offending

products from late 2013 to late 2015 does not effectively plead the "when" requirement under Rule 9(b). (Opp. p. 5.)

Plaintiff's "where" allegation, that "the labeling and packaging of the Products which indicates that the Products are natural," (Opp. p. 5; Compl. ¶ 37) misses the point. The issue is not where on the packaging the allegedly-offending statement appears. Rather, what Plaintiff must allege is where these alleged acts occurred, with specificity. For example, in *Pattie,* the Court held that failing to specify which store the plaintiff was shopping in when the alleged fraud occurred was insufficient to meet the requirements of Rule 9(b). *Pattie*, 29 F. supp. 3d at 1059. Similarly, Plaintiff here fails to identify where he was shopping at the time of the alleged fraud.

Plaintiff then reasserts his "how" allegation that "by making material misrepresentations on the Products' labeling and packaging that were designed to mislead consumers into purchasing of the Products under the mistaken belief that they are natural." (Opp. p. 5; Compl. ¶ 38.) Plaintiff misses the point, as he must explain how sugar allegedly derived from GMO beets makes a natural statement on the packaging fraudulent – and thus designed to mislead consumers. *See Pattie*, 29 F. Supp. 3d at 1059. He has not done so.

As it relates to fraudulent intent, Plaintiff argues that intent is only a required element of common law fraud and failure to adequately plead intent does not affect the Complaint. (Opp. p. 5.) The Court disagrees. The parties do not dispute that Plaintiff never alleges that Defendant knew its products contained GMO beets, or that even if it did, that it would not meet a reasonable consumer's definition of "natural." (Compl. ¶¶ 15-39.) However, under California law, Rule 9(b) mandates that a claim under the CLRA, UCL, and FAL "turns on whether [a plaintiff has] sufficiently established Defendants' knowledge" of the problem that led to the deception at the time of sale." *See Resnick v. Hyundai Motor Am., Inc.*, 2017 W L 1531192, at *14 (C.D. Cal.

Apr. 13, 2017) (discussing UCL and CLRA); *Resnick v. Hyundai Motor Am., Inc.*, 2017 WL 6549931, at *16 (C.D. Cal. Aug. 21, 2017 (discussing FAL). In this case, Plaintiff merely alleges that the Products may contain GMO beets and that the Products are labeled as "natural," (*Id.* at ¶¶ 17, 22, 24, 28), but does not allege facts showing that Defendant knew or should have known that the alleged presence of GMO beets would not qualify the Products as natural in the minds of reasonable consumers. *See Resnick*, 2017 WL 1531192, at *17. Under these circumstances, to allow Plaintiff's Complaint to move forward would encourage the type of fishing expedition that Rule 9(b) is designed to prevent. *Pattie*, 29 F. Supp. 3d at 1059.

### B. Plaintiff Has Failed To Plead Plausible Claims

To avoid a dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plaintiff's claims in the Complaint must be more than conceivable, they must be plausible. *Id.*; *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426. 430 (6th Cir. 2008). Plaintiff fails to meet the plausibility requirement, as he fails to plead (1) more than insufficient, generalized statistics to allege that Defendant's Products use sugar derived from GMO sugar beets, and (2) that his subjective definition of the term "natural" as free from GMOs is shared by a reasonable consumer.

First, Plaintiff fails to provide any facts showing that the Products contain sugar derived from GMO beets. Plaintiff merely alleges that half the sugar production in the United States came from sugar beets. *Id.* at ¶ 24. But he does not allege that the sugar in the Products is even derived from sugar beets, let alone GMO sugar beets. He also fails to show that the sugar contains any bioengineered genetic material. In *Osborne v. Kraft Food Grp., Inc.*, No. 15-02653, Dkt. No. 28 (N.D. Cal. Oct. 16, 2015), the court dismissed claims that failed to allege whether

the citric acid ingredient, which Plaintiff claimed was unnatural, could have been derived from GMO sources. The plaintiff complained generally about citric acid, but did not specify what type of citric acid was used in the product. The court concluded that the complaint not only failed to state a claim, but also "created a big Rule 11 problem" because the plaintiff "file[d] a lawsuit and then ask[ed] questions later." *Id.* at 11-12. Similarly, Plaintiff here has filed suit only to ask later whether Defendant's Products actually contain sugar from GMO beets, and even if they do, if that sugar contains any genetically modified material.

Plaintiff's generalized (and possibly outdated) statistics regarding the potential possibility of GMO-derived sugar beets in Defendant's Products are insufficient to meet the high bar of plausibility, which requires that he move from "conceivable to plausible." *Bassett*, 528 F.3d at 430. Plaintiff cites several inapposite cases for the proposition that his claims, as they stand, are sufficient. (Opp. at 3.) For example, in *Ault v. J.M. Smucker Co.*, 2014 WL 1998234, at *5 (S.D.N.Y. May 15, 2014), the court noted, "common sense dictates that one cannot rely on generalized statistics to make an inference about a particular product or person." *See also United States ex rel. Nathan v. Takeda Phar. N. Am., Inc.*, 708 F.3d 451. 459 (4th Cir. 2013) (refusing to draw an "implausible inference" where plaintiff failed to allege more than statistics). Nonetheless, here the only pieces of information Plaintiff relies on are generalized statistics regarding sugar beets "since the mid-1990s" and in the "2009/10 crop year" to state that the sugar in the Products possibly may be derived from a genetically-modified sugar beet crop. (Opp. at 2; Compl. ¶¶ 8, 24.) These "generalized statistics" from at least a decade ago are too attenuated to make a plausible claim regarding Defendant's Products' ingredients.

Moreover, these statistics show that only 50% of the sugar production in the U.S. "since the mid-1990s" even comes from sugar beets, let alone GMO sugar beet seed varieties. (Compl.

¶ 24.)  Plaintiff requests this Court to accept, base on a 50% probability, that the sugar in the Products is from sugar beets and that those sugar beets were of the GMO variety.  This does not move the needle from conceivable to plausible, as the Sixth Circuit requires to survive a motion to dismiss.  *See Bassett*, 528 F.3d at 430.

Plaintiff neglects to provide any other facts or details apart from his generalized statistics to argue that the Products actually contained sugar derived from GMO beets.  Accordingly, he fails to reach the bar of plausibility required at the pleading state.  *See Osborne*, No. 15-02653, Dkt. No. 28 (N.D. Cal. Oct. 16, 2015) (dismissing the plaintiff's claim for failing to specify the type of citric acid used in the product that the plaintiff alleged was "unnatural because it could have been derived from GMO sources).

Second, Plaintiff fails to plead adequate facts supporting why he considers GMO sugar beets to be "unnatural" or allege a specific standard by which to measure "GMO sugar beets" against the term "natural."  In his Opposition, Plaintiff argues that because his Complaint asserts that "numerous third parties – including industry, government, and health organizations – do not consider GMOs to be 'natural' because they are created artificially in a laboratory . . .," he reaches the threshold of plausibility.  (Opp. p. 3.)  But Plaintiff must do more to survive a motion to dismiss.  *See Figy v. Frito-Lay N. Am. Inc.*, 67 F. Supp. 3d 1075, 1089 (N.D. Cal. 2014) (granting a motion to dismiss where the plaintiffs failed to plead that "their subjective definition of the term 'All Natural' is one that is shared by the reasonable consumer."); *Chin v. Gen. Mills*, 2013 WL 2420455, at *9 (D. Minn. June 3, 2013) (dismissing claims alleging product contained highly processed and non-natural sugar substitutes," and other ingredients, without more); *Pelayo v. Nestle USA, Inc.*, 989 F. Supp. 2d 973, 978-80 (C.D. Cal. 2013) (granting motion to dismiss for the plaintiff's failure to explain in detail what "All Natural" meant); *Kane v.*

*Chobani*, 973 F. Supp. 2d 1120, 1138 (N.D. Cal. 2014) (vacated and remanded on other grounds) (dismissing claims that failed to plead what "all natural" means, what the offending ingredients were, and what was unnatural about them).

Whether GMOs are created in a laboratory is not relevant to the question about a reasonable consumer's beliefs about the Products and whether they are natural. The Complaint does not allege that the sugar beets used to make the Products were grown in a laboratory, and they were indisputably grown in the ground. The Complaint also fails to explain what aspect of the sugar beets was genetically modified, when they were genetically modified, and what is different about them from non-genetically modified sugar beets. Finally, the Complaint fails to explain when, in the genealogy of sugar beets, they suddenly became genetically modified and no longer natural in the eyes of reasonable consumers. Without any such explanation, his claims are not plausible.

Finally, Plaintiff argues that Defendant is "attempt[ing] to create a factual dispute" on the plausibility issue. (Opp. p. 3.) The Court disagrees. Defendant has not asserted any contrary facts. Rather, Defendant simply points out Plaintiff's failure to adequately plead his claims. For all of the reasons discussed, Plaintiff's claims do not meet the plausibility standard, and must be dismissed.

### C. Plaintiff's California Statutory Claims Fail

Plaintiff's claims on behalf of the California Class for alleged violations of the CLRA, FAL, and UCL (Compl. ¶¶ 43-61) are judged under the reasonable consumer standard. *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008); *Pelayo*, 989 F. Supp. 2d at 977. This test "focuses on whether members of the public are less likely to be deceived" and requires that "a significant portion of the general consuming public or of targeted consumers, acting

reasonably under the circumstances, could be misled." *Id.* at 977-78 (internal quotation marks and punctuation omitted). "This requires more than a mere possibility that [Defendant's] label 'might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016). Dismissal is appropriate when the court can conclude as a matter of law members of the public are not likely to be deceived. *Pelayo*, 989 F. Supp. 2d at 878.

Here, Plaintiff fails to allege an objective, commonly-understood definition of "natural," or that reasonable consumers would find "natural" deceptive in this context. *Id.* He merely asserts that consumers would not consider products containing sugar derived from GMOs to be "natural." *See, e.g.*, Compl. ¶¶ 6, 30. But he does not allege that consumers believe products derived from GMO ingredients – but that may not contain any genetically-modified material – are not "natural." Additionally, Plaintiff has not alleged that the Products do not comply with federal regulations or with the FDA's statements on the use of "natural" in food labeling.

Further, Plaintiff provides no evidence to support conclusory allegations that reasonable consumers would consider the labels misleading in context. He quotes Monsanto, the World Health Organization, the Environmental Protection Agency, and a 2014 consumer survey (*Id.* at ¶ 25), but none deal with the Products at issue. And while they all come to different conclusions about how GMOs are created, they do not assert that reasonable consumers believe ingredients derived from GMOs are not "natural."

Defendant cites cases that are persuasive on the issue of whether Plaintiff's California claims should be dismissed as speculative. In *Podpeskar v. Dannon Company, Inc.*, the court dismissed as speculative the plaintiff's claims that yogurt labeled as "natural" was deceptive because "the cows that produced the milk that produced the yogurt may, at some point, have

eaten feed made from corn that was genetically modified."  2017 WL 6001845, at *1, 5

(S.D.N.Y. Dec. 3, 2017) ("There is no legal support for the idea that a cow that eats or is

subjected to hormones or various animal husbandry practices produces 'unnatural' products.").

Even if some consumers "might hazard such an assumption," (*Ebner*, 838 F.3d at 966), that the

word "natural" applies to every step along the food chain, Plaintiff's allegations do not support

the idea that a reasonable consumer would take such a draconian view.  This is particularly true,

the court found, because Plaintiff did not include any allegations that Defendant "specifically

represent[ed] that its products are [] GMO-free."  *Podpeskar*, 2017 WL 6001845, at *5.  The

court also noted that the plaintiff, as here, failed to allege that many of the ingredients in the

products were unnatural.  *Id.* at *5 ("her claim is that several steps back in the food chain, there

may have been something unnatural ingested by a cow.")

Similarly, in *Gallagher v. Chipotle Mexican Grill, Inc.*, the court found that the plaintiff's

definition of "GMO" was inadequate, in part because she failed to allege that the animals

themselves (from which the allegedly unnatural dairy and meat derived) were genetically

modified.  2016 WL 454083, at *4 (N.D. Cal. Feb. 5, 2016) ("there seems to be no dispute that

the meat and dairy ingredients used by Defendant were not themselves genetically engineered in

any fashion.")

Plaintiff claims that these cases cited by Defendant are "inapposite" because they

involved allegations that dairy and meat products came from animals that were fed GMO crops,

and there were "no allegations that *the animals* from which Defendant's meat and dairy

ingredients were produced were genetically modified."  (Opp. p. 6 (emphasis included in

original).)  But here, Plaintiff alleges the sugar beets that were used in the Products, that had a

50-50 chance of being genetically modified, that were then combined with numerous other

ingredients to make peanut butter, are not natural to a reasonable consumer. The Court agrees with Defendant that "[t]his is just as attenuated as the argument in *Podpeskar* that the milk that produced the yogurt came from cows that may, at some point, have eaten feed made from corn that was genetically modified. *Podpeskar*, 2017 WL 6001845, at *1.

In support of his position, Plaintiff cites *Reilly v. Chipotle Mexican Grill, Inc.* The Court does not find this case particularly instructive. *Reilly* dealt with a claim that Chipotle was explicitly advertising its food as containing "non-GMO ingredients." 2016 WL 10644065, at *4 (S.D. Fla. Apr. 20, 2016). In the present case, Defendant did not label its products "non-GMO," "GMO free," or "free from GMO ingredients."

In sum, Plaintiff here does not contend that the actual peanut butter Products are genetically modified. (Compl. ¶¶ 23-24.) Rather, he argues that one part of one ingredient several steps removed might be genetically modified. (Compl. ¶¶ 23-24.) These claims are speculative and are insufficient to show that a reasonable consumer would be deceived under the CLRA, FAL, and UCL. These statutory claims must therefore be dismissed

### D. Plaintiff's Claims For Breach Of Express Warranty Fail

Plaintiff's breach of express warranty claim on behalf of the Multi-State Class fails for multiple reasons. First, he does not plead all of the elements to state a claim. Second, he cannot bring this claim as a class action under the laws of 44 states.

"To state a claim for breach of warranty under the [Ohio] UCC, a plaintiff must plead that: (1) a warranty existed; (2) the product failed to perform as warranted; (3) plaintiff provided defendant with reasonable notice of the defect; and (4) plaintiff suffered injury as a result of the defect." *St. Clair*, 581 F. Supp. 2d at 902. Here, however, Plaintiff never pleaded that the labels warranted that the Products were GMO-free. Nor did he plead a satisfactory definition of

"natural" that excludes GMO products or products with ingredients derived from GMOs. (*See* Compl. ¶ 25.) Plaintiff provides only conclusory allegations that the Products are not "natural." Plaintiff also does not allege that the products actually contain sugar derived from bioengineered sugar beets (Compl. ¶ 24), or even if they do, that the sugar contains any detectable bioengineered material. Thus, he has failed to plead facts showing that a warranty existed or that Defendant's product was not "natural."

Plaintiff ineffectively cites cases that he purports allow for a product labeled as "natural" to be grounds for a breach of express warranty claim. (Opp. p. 10.) These cases are not factually similar to the circumstances here because they have nothing to do with the GMO allegations asserted in this case. In *Silva v. Smucker Nat. Foods, Inc.*, the ingredients at issue were phosphoric acid and caramel color. 2015 WL 5360022, at *10 (E.D.N.Y. Sept. 14, 2015). The Complaint in that case alleged that "phosphoric acid functions . . . to impart flavor . . . and qualifies as an artificial flavor under 21 C.F.R. § 101.22(a)(1)." *Id.* at *7. The complaint went on to recite the definition of "artificial flavoring," and to explain why those two ingredients met the definition. Similarly, in *Musgrave v. ICC/Marie Callender's Gourmet Prods. Div.*, the ingredient at issue was Sodium Acid Pyrophosphate ("SAPP"). 2015 WL 510919, at *1, 7, 10 (N.D. Cal. Feb. 5, 2015). The court in that case noted that SAPP was a "synthetic ingredient," and that Plaintiff alleged that "under FDA policy, a product is not natural if it contains . . . synthetic substances." *Id.* (internal quotations omitted).

Here, conversely, Plaintiff has not alleged that GMO-derived sugar beets are synthetic. Alleging that food is created in a lab "utilizing different modern scientific techniques" is not the same as alleging that ingredients are unnatural. (Compl. ¶ 25(c).) Plaintiff does not claim that GMO-derived sugar beets are chemically created. Plaintiff also does not point to a specific

statute or regulation that would deem GMO-derived sugar beets as unnatural. Defendant has complied with the FDA's policies and regulations regarding product labeling to the extent the sugar in the Products is derived from GMO sugar beets. Nothing in the Complaint says otherwise.

Plaintiff's reliance on *Janney v. Mills*, 2014 WL 1266299, at *5 (N.D. Cal. Mar. 26, 2014), is misplaced, as it does not even address breach of warranty or "actionable warranty," as Plaintiff claims. (Opp. p. 11.) Rather, that case discusses whether it was "mere puffery" to assert that a product was all natural when it contained high fructose corn syrup, high maltose corn syrup, and maltodextrin. The plaintiff there alleged that, "producing these ingredients requires multiple processing steps in an industrial environment, which transform starches into substances that are not found in nature . . " and therefore, "they cannot be described as Natural." *Id.* at *1 (internal quotations omitted). In the instant Complaint, Plaintiff's facts are far more attenuated, as he fails to explain why GMO-derived sugar beets are unnatural, as the plaintiff did in *Janney*.

Plaintiff here provides only conclusory allegations that the Products are not "natural." (Compl. ¶¶ 23-25.) Plaintiff never pleaded that the labels warranted the Products were GMO-free. Nor did he plead a satisfactory definition of "natural" that excludes GMO products or products with ingredients derived from GMOs. Plaintiff also does not allege that the Products actually contain sugar derived from bioengineered sugar beets (Compl. ¶ 24), or, even if they did, that the sugar contained nay detectable bioengineered material that would make the Products "unnatural." *Id*.

The Court is not convinced by Plaintiff's argument that, "read as a whole and construed in Plaintiff's favor, it is clear from the Complaint that Plaintiff has defined 'natural' to exclude

products containing GMO ingredients or GMO-derived ingredients." (Opp. p. 11.) To the extent Plaintiff seeks now to define "natural," which he has not done in the Complaint, he is improperly attempting to amend his complaint through his Opposition. *Brown v. Whirlpool Corp.,* 996 F. Supp. 2d 623, 645 (N.D. Ohio 2014) ("It is hornbook law that a complaint cannot be amended by briefs in opposition.") (internal quotations omitted).

Plaintiff's breach of express warranty claims also fail because Plaintiff did not provide adequate pre-suit notice. In his Opposition, Plaintiff argues that the letter he sent on April 13, 2015 prior to filing his Complaint is adequate pre-suit notice. (Opp. at 11.) He contends that the Complaint "taken as a whole and with all reasonable inferences drawn in Plaintiff's favor" was enough to put Defendant on notice for a breach of warranty claim. *Id.* Plaintiff is mistaken. All Plaintiff sent prior to filing suit was a pre-suit CLRA demand. Plaintiff did not send anything specifically notifying Defendant of a breach of express warranty claim. Neither filing a lawsuit nor claiming that Defendant should have had knowledge constitutes notice under applicable law. *See St. Clair*, 581 F. Supp. 3d at 902-03 (N.D. Ohio 2008) (dismissing a breach of warranty claim for failing to give notice of that claim, specifically); *Vinson v. J.M. Smucker Co.,* 2013 WL 6987087, at *9 (C.D. Cal. Mar. 25, 2013).

Plaintiff argues that he was not required to give pre-suit notice for his California claim because he purchased the Products from third-party retailers. (Opp. p. 12 (citing *Rosales v. FitFlop USA, LLC*, 882 F. Supp. 2d 1168, 1178 (S.D. Cal. 2012)). However, at best, the *Rosales* exception to the pre-suit notice requirement is only applicable to a California breach of express warranty claim. (Opp. p. 12.) Thus, even if Plaintiff was not required to give pre-suit notice to the manufacturer in California under *Rosales*, this shows why, as explained below, his express warranty claim under the laws of 44 states is unmanageable.

Plaintiff is attempting to bring suit for breach of express warranty in 44 states with varying requirements in each state. This is unmanageable and fatal even at the pleading stage because breach of express warranty varies widely from state to state making it unsuitable for class-wide resolution. *In re Caterpillar, Inc., C13 and C15 Engine Prods. Liab. Litig.*, 2015 WL 4591236, at *25 (D.N.J. July 29, 2015) (noting that "state laws regarding breach of express warranty vary widely"); *see Pilgrim*, 2010 WL 1254849, at *4 (dismissing class claims for unjust enrichment because they "vary significantly from state to state"). To succeed, each individual class member would be required to demonstrate that the law of its state was violated through [Defendant's] marketing and sale [of the Products]. Such a task [though] would make this case unmanageable as a class action." *Pilgrim*, 2010 WL 1254849, at *4.

The elements for breach of express warranty differ from state to state, including whether reliance, pre-suit notice, or privity are required. In Ohio, reliance is not required but pre-suit notice is. In Indiana, neither is required. Texas class members would have to show both. Ten states require both reliance and pre-suit notice, three states require reliance but have not decided on pre-suit notice, seven states require reliance but not pre-suit notice, ten states require pre-suit notice but not reliance, eight states do not require reliance and have not decided on pre-suit notice, and five states do not require either. Furthermore, different class members have different privity requirements. Under Ohio law, for example, privity is not required. *Caterpillar Fin. Servs. Corp. v. Harold Tatman & Son's Ents., Inc.*, 50 N.E. 3d 955, 960 (Ohio Ct. App. 2015). But in Illinois, "privity of contract is required to enforce an express warranty where economic loss is alleged." *Northern Ins. Co. of N.Y. v. Silverton Marine Corp.*, 2010 WL 2574225, at *2 (N.D. Ill. June 23, 2010). Accordingly, Plaintiff's Multi-State claim for breach of express warranty is unmanageable and must be dismissed. *See In e Am. Med. Sys., Inc.*, 75 F.3d 1069,

1085 (6th Cir. 1996) ("[i]f more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law.").

Plaintiff characterizes this as a Rule 23 argument that is "premature and flawed" and argues that the Court should allow this case to go forward. (Opp. p. 12.) However, despite Plaintiff's contention, this issue can be determined at the Motion to Dismiss state. *See Pilgrim v. Universal Health Card, LLC*, 2010 WL 1254849, at *4 (N.D. Ohio, Mar. 25, 2010) (dismissing class claims at the motion to dismiss state because "consumer laws and the law on unjust enrichment vary significantly from stat to state." (citing *In re McDonald's French Fries Litig.*, 257 F.R.D. 669. 673-74 (N.D. Ill. 2009)); *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002) ("Because these [consumer-protection] claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable.").

Neither of the cases Plaintiff cites in support are relevant. In *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 851 (6th Cir. 2013), the Court dismissed the necessity of occasional consideration of the merits at the class certification stage, and in *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 422-23 (6th Cir. 1998), the Court reversed and remanded the case with instruction for the district court to examine the constitutional standing requirement. Neither case found it premature for a court to dismiss an action at the motion to dismiss state due to unmanageability problems.

Second, Plaintiff argues that his claim is immune from state warranty law variations because: (1) pre-suit notice "is not an issue;" (2) "every putative class member" is not in privity with Defendant; and (3) he has adequately alleged "reliance." (Opp. p. 13.) These arguments fail to explain why a multi-state class alleged under 44 different state laws with the same conclusory claims is manageable.

The fact remains that there are 44 different state breach of express warranty laws alleged, where the states vary widely in their requirements to assert such a claim. Because Plaintiff has failed to explain why the class is manageable, the breach of express warranty claims must be dismissed. *See In re Am. Med. Sys., Inc.*, 75 F.3d at 285.

Plaintiff argues that "any variations in state law can be addressed by subclasses." (Opp. p. 13.) This argument is not well-taken. Plaintiff fails to account for the fact that he must still adequately plead his Complaint. Plaintiff's argument that subclasses are an available organizational method used by courts is not responsive to the unmanageability problem present here. Thus, Plaintiff's reliance on *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 546 (6th Cir. 2012), for this general proposition is unavailing. Likewise, Plaintiff's reliance on *Matrinelli v. Johnson & Johnson*, 2019 WL 1429653, at *10 (E.D. Cal. Mar. 29, 2019), is unhelpful. There, the court allowed for the use of subclasses where there were only 10 state laws (in contrast to the 44 pled here) alleged in the multi-state class. Further, the court did not comment on the applicability of subclasses in response to a manageability problem.

In *Hart v. BHH, LLC*, the court explained that "[i]n the event that there are material variations in the law of the fifty states, the Court may employ subclasses or decertify those state law subclasses whose adjudication becomes unmanageable." 2017 WL 2912519, at *8 (S.D.N.Y. July 7, 2017) (internal citation omitted.) In *In re Teletronics Pacing Sys., Inc.*, 172 F.R.D. 271, 292 (S.D. Ohio 1997), the court commented only on the possibility of using subclasses to deal with variations in state laws. But neither case deals with Defendant's argument that the invocation of 44 different express warranty laws is unmanageable. To be sure, in the Sixth Circuit, "subclasses are not [a] substitute for compliance with Rule 23." *Sprague v.*

*Gen. Motors Corp.*, 133 f.3d 388, 399 n. 9 (6th Cir. 1998). Accordingly, for all of the reasons

stated, Plaintiff's breach of warranty claims must be dismissed as unmanageable.

      **E.**      **Plaintiff's Claims Must Be Dismissed Under The Safe Harbor Doctrine**

      The Safe-Harbor doctrine holds that where "the Legislature has permitted certain conduct

or considered a situation and concluded that no action should lie," there can be no liability.

*Barber v. Nestle USA, Inc.*, 154 F. Supp. 3d 954, 958 (C.D. Cal. 2015) (quoting *Cel-Tech*

*Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 541 (Cal. 1999)). Defendant

argues that Plaintiff's California state-law claims are precluded under the safe-harbor doctrine.

The Court agrees.

      The FDA has determined that sugar derived from GMO sugar beets does not have to be

disclosed on labels as it is discretionary. *See* 7 C.F. R. § 66.1116(b); 7 C.F.R. § 66.6. Because

Defendant complies with FDA labeling regulations, it cannot be liable under state consumer law

for failing to inform consumers that the item they purchased potentially contains sugar derived

from GMO beets.

      Where an FDA regulation gives requirements, those "may not be trumped by the general

prohibitions" present in California's CLRA, FAL, and UCL. *Alvarez v. Chevron Corp.*, 656

F.3d 925, 934 (9th Cir. 2011) (finding a safe harbor applied where the company complied with

all California regulations). *See also Pom Wonderful LLC v. Coca Cola Co.*, 2013 WL 543361, at

*5 (C.D. Cal. Feb. 13, 2013) (finding that the safe-harbor doctrine disallowed plaintiff's UCL

and FAL claims because the defendant had followed all FDA regulations on labeling).

      Defendant is shielded under the safe-harbor doctrine because it complied with FDA's

policies regarding product labeling for sugar derived from GMO beets. *See Ebner*, 2012 WL

9760035 at *5-6 (shielding the defendant from any basis of liability for following all labeling

guidelines at law); *Cel-Tech Comms., Inc.*, 973 P.2d at 541 ("[P]laintiffs may not use the general

unfair competition law to assault that [safe] harbor."). Under 7 C.F.R. § 66.116(b), effective

February 19, 2019, the FDA determined that foods on the "List of Bioengineered Foods," under

7 C.F.R. § 66.6, may disclose their GMO nature on a label, if they so choose. Since this is

permissive, and not mandatory, Defendant is in compliance with FDA regulation. *POM

Wonderful LLC*, 2013 WL 543361, at *1 (labeling practices in compliance with FDA regulations

could not be the basis for consumer protection liability); *Parent v. MillerCoors LLC*, 2015 WL

64455752, at *4 (S.D. Cal. Oct. 26, 2015) (safe harbor barred the plaintiff's claims for beer

labeling).

      Plaintiff argues that the safe-harbor doctrine is not applicable because he does not seek to

require Defendant to disclose the presence of GMO ingredients. (Opp. p. 16.) This argument

misses the point. There is no law prohibiting the use of natural, and there can be no liability

where the Legislature has already ruled on an issue. *Barber v. Nestle USA, Inc.*, 154 F. Supp. 3d

954, 958 (C.D. Cal. 2015). The FDA has determined that sugar derived from GMO sugar beets

does not have to be disclosed on labels, as it is discretionary. *See* 7 C.F.R. § 66.116(b); 7 C.F.R.

§ 66.6. Because Defendant has complied with FDA labeling regulations, it cannot be prohibited

from using the term "natural" – nor can it be liable as a matter of law for failing to inform

consumers that the item they purchased was potentially derived from GMO beets. *See Ebner*,

2013 WL 9760035 at *5-6. Accordingly, Plaintiff's state law claims must be dismissed.

      **F.**    **Defendant's Additional Arguments**

      In addition to the arguments discussed above, Defendant makes further arguments in

support of its motion to dismiss. First, Defendant argues that Plaintiff's UCL and FAL claims

fail because Plaintiff cannot seek equitable remedies under those statutes where Plaintiff would

have an adequate remedy at law.  Second, Defendant argues that Plaintiff's claims for disgorgement and restitution are improper.  Third, Defendant contends that punitive damages are unavailable and are inadequately pled.  Finally, Defendant claims that Plaintiff's claims are preempted by Federal Law.  Although these arguments may contain merit, the Court need not address them here, as dismissal of Plaintiff's claims is required for the reasons already discussed.

## IV.  <u>CONCLUSION</u>

For all of the reasons fully discussed herein above, the Court hereby ORDERS that the Motion to Dismiss (Doc. 89) is GRANTED.  Plaintiff's Complaint is dismissed in its entirety. Furthermore, Plaintiff's Motion to Changer or Transfer Venue to the Northern District of California (Doc. 93) is DENIED AS MOOT.


IT IS SO ORDERED.



Dated: March 31, 2020                    s/John R. Adams
                                         JOHN R. ADAMS
                                         UNITED STATES DISTRICT JUDGE